UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
SECURITIES AND EXCHANGE COMMISSION,     :
                                        :
                   Plaintiff,           :
                                        :
              -v-                       :
                                        :      09 Civ. 8261 (DLC)
IRWIN BOOCK, STANTON B.J. DEFREITAS,    :
NICOLETTE D. LOISEL, ROGER L. SHOSS and :      OPINION AND ORDER
JASON C. WONG,                          :
                                        :
                   Defendants,          :
                                        :
              and                       :
                                        :
BIRTE BOOCK and 1621533 ONTARIO, INC.,  :
                                        :
                   Relief Defendants.   :
                                        :
----------------------------------------X

APPEARANCES:

For the plaintiff:
Justin Chretien
Paul W. Kisslinger
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549

For defendant Jason C. Wong:
Russell Cornelius Weigel, III
Edward Robert Averbuch
Law Office of Russell C. Weigel, III, P.A.
5775 Blue Lagoon Drive
Suite 100
Miami, FL 33126


DENISE COTE, District Judge:

     The plaintiff, the United States Securities and Exchange

Commission ("SEC"), brought this action against five defendants

-- Irwin Boock ("Boock"), Stanton B.J. DeFreitas ("DeFreitas"),
Nicolette D. Loisel ("Loisel"), Roger L. Shoss ("Shoss") and
Jason C. Wong ("Wong") (collectively, the "Defendants") --
alleging a securities fraud scheme whereby these individuals
hijacked defunct or inactive corporations, issued unregistered
stock and sold the securities in violation of the antifraud and
registration requirements of the federal securities laws (the
"Scheme").  The Court has entered a default as to Boock and
DeFreitas.  This action is stayed with regard to Loisel and
Shoss pending criminal proceedings against them.

     The SEC filed a motion for summary judgment as to Wong on
February 25, 2011, seeking judgment on its claims under Section
5 of the Securities Act of 1933, 15 U.S.C. § 77e(a) ("Section
5"); Section 17(A) of the Securities Act of 1933, 15 U.S.C. §
77q(a) ("Section 17(a)"); Section 10(b) of the Securities
Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)"); and
Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").  Wong cross-
moved for partial summary judgment on the same day, seeking
dismissal of the SEC's claim against him under Section 5 as well
as the SEC's requested relief of disgorgement.

     On April 14, the SEC filed a motion to strike portions of
Wong's reply brief in support of his motion for partial summary
judgment.  In addition, within the briefing on both parties'
motions for summary judgment, both parties have requested to

strike from the record various exhibits relied upon by the
other.   For the following reasons, the SEC's motion for summary
judgment is granted in part, Wong's motion for partial summary
judgment is denied, the SEC's motion to strike is granted in
part, the SEC's other requests to strike are granted in part,
and Wong's requests to strike are denied.


BACKGROUND

I.   The Hijacking Scheme

     The following facts are undisputed unless otherwise
indicated.   The SEC alleges that the Defendants took control of
inactive public corporations (the "Hijacked Corporations")[1] in a

---

[1]   For the purposes of this Opinion, each Hijacked Corporation
will be consistently called by a short form of one of its
corporate names, even though each underwent several name changes
over the course of the Scheme.   The following table lists
companies alleged by the SEC to have been targeted by the Scheme
and the short form name which will denote that corporate entity,
even at times when it may have formally carried one of its
alternate names.   This chart includes only 23 of the 43 entities
listed in the complaint, as these are the entities referenced
most often in relation to Wong.

| Company and Short Form | Former or Subsequent Name(s) |
| --- | --- |
| AEI Transportation Holdings ("AEI Transportation") | XO Logic Inc. |
| Alcar Chemicals Group, Inc. ("Alcar Chemicals") | Birman Managed Care, Inc.; Hackerproof Ltd. |
| Asia Telecom Ltd. ("Asia Telecom") | Jalate Ltd. |
| Baker Communications Inc. ("Baker Communications") | China Adnet Enterprises Inc. |

| | |
|---|---|
| Bicoastal Communications, Inc. ("Bicoastal Communications") | The Pathways Group, Inc. |
| Big Hub.com Inc. ("Big Hub") | Advanced Growing Systems, Inc. [FL] |
| Caribbean Developments Inc. ("Caribbean Developments") | All for a Dollar, Inc.; Think Again, Inc.; VShield Software Corp. |
| Cavico Corporation ("Cavico") | Laminaire Corporation |
| El Apparel Inc. ("El Apparel") | Biscayne Apparel, Inc.; NutriOne Corp. |
| Grand Lux, Inc. ("Grand Lux") | Kaplan Industries, Inc.; World Hockey Association Corp. |
| Inolife Pharma, Inc. ("Inolife Pharma") | Balfour Maclaine Corp. |
| International Energy Ltd. ("International Energy") | BDW Holdings, Ltd.; Pacific Coast Apparel, Inc. |
| KSW Industries, Inc. ("KSW Industries") | Kay Merchandising International, Ltd.; KDW Telecom Inc. |
| LeaseSmart Inc. ("LeaseSmart") | Xxsys Technologies, Inc. |
| Level Vision Electronics Ltd. ("Level Vision") | EcoTyre Technologies Inc. |
| Lotta Energy Acquisition Corp. ("Lotta Energy") | Ensec International, Inc. |
| Magellan Energy Corp. ("Magellan Energy") | The Eastwind Group, Inc. |
| Marinas International Inc. ("Marinas International") | Brazos Sportswear Inc. |
| Microlink Solutions Inc. ("Microlink Solutions") | Universal Seismic Associates Inc. |
| Natural Medicines Ltd. ("Natural Medicines") | Imark Technologies, Inc. |
| PCC Group, Inc. ("PCC Group") | Advanced Growing Systems, Inc. [NV]; Non-Lethal Weapons, Inc. |
| TCPI, Inc. ("TCPI") | Packaged Home Solutions |

process that would begin one of two ways.  In some cases, one of the Defendants would falsely represent to the secretary of state of the state in which the defunct public corporation was incorporated that he was duly authorized to revive the corporation.  In other cases, where the inactive public corporation was void in its state of incorporation, one of the Defendants would instead incorporate a new corporation in the same name of the void corporation.  Whether they had newly incorporated a company or gained control over a pre-existing one, the next steps in the Scheme were to change the name of the company, effect a reverse stock split to reduce the number of outstanding shares, and submit fraudulent and deceptive paperwork in order improperly to obtain new Committee on Uniform Security Identification Procedures ("CUSIP") identification numbers and stock ticker symbols.  These manipulations would result in all outstanding shares in those public corporations being changed to the new ticker symbol.  The Defendants then issued new unrestricted and unregistered shares into the marketplace.  The SEC alleges that Boock conceived of the Scheme and carried it out with respect to certain companies with Loisel and Shoss, and with respect to other companies with DeFreitas

| United Environmental Energy Corp. ("United Environmental Energy") | Eagle Finance Corp. |

and Wong.  Boock admitted to all the allegations against him in the complaint at his deposition on January 13, 2011.[2]  DeFreitas has also admitted many of the allegations and his part in the Scheme as part of an agreement with the SEC.

II.  Wong's Involvement in the Hijacking Scheme

The SEC has offered evidence to show that Wong had a significant role in the Scheme.  He was made aware that other Defendants were locating dormant public companies.  Wong would then file documents with various secretaries of state to incorporate new entities, file documents with regulatory entities so that these entities could assume the identity of the dormant public companies, corresponded with some clients interested in shell deals, and caused the Hijacked Corporations to issue shares.

---

[2]  Wong's "Statement of Controverted Facts made pursuant to Local Rule 56.1," introduces an affidavit by Boock in which he states that at the time of his deposition, he was under duress because of his wife's health condition and he was taking unspecified medication that affected his awareness.  He also asserts that during a break in the deposition he had made an agreement with the SEC in which the SEC would ask this Court for a stay of proceedings.  These statements all directly contradict his deposition testimony that the SEC had made no promises to him in exchange for his admissions, that he was not under duress, and that his admissions were not related to his or his wife's health conditions.  "It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."  Estate of Hamilton v. City of New York, 627 F.3d 50, 54 (2d Cir. 2010) (citation omitted).  Boock's affidavit, therefore, does not create a disputed issue of material fact.

Prior to 2003, Wong had a close personal friendship and business relationship with Boock, a friendship which continues still.  Wong's early business activity demonstrates familiarity with various functions necessary to carry out the Scheme.  In 2002, he co-founded and served as president of a private company called Online Database Solutions, Inc. ("Online Database Solutions") in Ontario.  In 2003, he and a business partner, Kervin Findlay ("Findlay"), purchased a public shell company incorporated in Nevada, Database Solutions, and merged it with his pre-existing private company, Online Database Solutions. Wong later became the sole owner of private Ontario corporations 1606884 Ontario, Inc. ("1606884 Ontario"), JWV, Inc. ("JWV"), and Eventing Capital, as well as the private Delaware corporation World Eventer.  Also starting in 2003, Wong began receiving inquiries from companies seeking financing.  He referred them to Shoss, among others.

The participants in the Scheme maintained regular contact. Between July 1, 2004 and May 17, 2006, Wong and Boock exchanged 1,704 calls between numbers that Boock and Wong do not deny were theirs.  Between June 13, 2005 and March 13, 2006, Wong and DeFreitas exchanged 251 calls.  Wong also exchanged telephone calls with Loisel and Shoss between June and September 2005.

A. Locating Dormant Public Companies

Boock located dormant public companies and provided their
trading symbols to other participants in the Scheme.  Wong was
informed that the Scheme involved dormant public companies that
were to be hijacked.  Emails among Wong, DeFreitas and Boock
provide some information as to Wong's exercise of control over
these dormant public companies.  For example, in October 2004
Wong emailed DeFreitas to ask if he should sign documents on
behalf of shell company Caribbean Developments.  Boock emailed
Wong in September 2005 with the website address for Marinas
International, a Hijacked Corporation, and indicated that he
hoped that the company was theirs.  In another September 2005
email, Wong forwarded Boock an email he received from the
officer of a target Hijacked Corporation accusing him of trying
to take over the company illegally.  Boock replied to this
email, telling Wong that he should respond by threatening legal
action against the complaining officer.

B. Incorporating and Filing Corporate Documents for New
   Private Entities

Wong was involved in the incorporation of many of the new
entities that were part of the Scheme.  For example, Wong paid
to incorporate KSW/Energomash J/V Ltd., a proposed joint venture
between a KSW Industries, a hijacked entity and a Russian
company, in Delaware in September 2005.  Between June 23 and

November 23, 2005, Wong exchanged eight telephone calls with the office of the Delaware Secretary of State.

Documents filed with the California Secretary of State in July 2005, January 2006 and September 2006, name Wong as an officer of International Energy, PCC Group, LeaseSmart, and Baker Communications, all companies affiliated with the Scheme. Many of these filed documents also list the name of Findlay, Wong's business partner and employee at Online Database Solutions.  Other than Baker Communications, each of these companies' California records list a post office box in Orlando, Florida which Boock testified he used along with Wong (the "Orlando Post Box").  On February 15, 2006, Wong communicated by telephone with the California Secretary of State's office.

Florida Department of State records dated from 2003 to 2006 list Wong as an agent for Grand Lux.  Florida Department of State records also show that Wong was an incorporator of El Apparel in July 2005 and the submitter of incorporation documents for TCPI in February 2006.  These Florida records listed either an address which Wong admits was the business address for his company or the Orlando Post Box, which Boock admits he shared with Wong.  On March 27, 2006, Wong communicated by telephone with the Florida Department of State's office.

9

C. Filing Fraudulent Documents to Assume the Identity of Defunct Public Companies

1. Requesting New CUSIP Numbers for the Target Public Companies

New CUSIP numbers were necessary to reflect the new names given to the Hijacked Corporations by the participants in the Scheme. Wong's name appeared as a requester for new CUSIPs numbers on papers filed with Standard & Poor's CUSIP Global Services ("CUSIP Services") for Big Hub, Caribbean Developments, Marinas International, Alcar Chemicals, PCC Group and International Energy. These filings listed the Orlando Post Box and an email address with which CUSIP Services corresponded with Wong or someone claiming to be Wong. CUSIP Services confirmation letters regarding CUSIP number changes were sent to Wong at the Orlando Post Box, or, with regard to Grand Lux, listed his Ontario business address.

The number and frequency of requests under Wong's name raised a red flag with the manager for operations at CUSIP Services. The name "John Sparrow" was used on CUSIP number change requests for LeaseSmart, listing a telephone number and address associated with Boock. In other CUSIP Services documents, John Sparrow was associated with Wong and Select American Transfer ("SAT"), Wong's company. Between July 15, 2005 and October 4, 2007, Wong made or received six telephone calls with CUSIP Services.

2. Requesting new NASDAQ Symbols and Reverse Stock Splits
   for the Hijacked Public Companies

In April 2005, Boock incorporated SAT under an alias in
Delaware using his own address and telephone number.  Boock
listed Wong as the sole director and included Wong's address in
the incorporation documents.  Wong registered SAT with the SEC
later that month, naming himself as president and CEO.  Wong
obtained a fax number and email address for SAT in April 2005.
Until September 9, 2005, he was the sole director of SAT.
Although there is some dispute about when Wong formally resigned
as director -- Wong claimed in his deposition that he resigned
either in June 2005 or on August 19, 2005, and bank records show
he resigned in December 2005 -- there is undisputed evidence
that Wong was involved in SAT's operations, whether or not he
retained a formal title, at least through late 2005.  Wong has
offered no documentary evidence of a date of resignation earlier
than that supported by the bank records.  These records, as well
as check drafts and the testimony of DeFreitas and Saudia Allie
("Allie"), SAT's employee, indicate that Wong maintained a
presence at SAT and was paid by SAT at least to the end of 2005,
and possibly until March 2006.

SAT served as a transfer agent for 37 companies, sixteen of
which are Hijacked Corporations.  As part of its role as a
transfer agent, SAT submitted Transfer Agent Verification Forms

11

("TAVF"s) that were filed with NASDAQ Stock Market, Inc.'s
Market Operations division ("NASDAQ") by issuers that requested
symbol changes to reflect name changes.  A TAVF submitted in
July 2005 for International Energy listed Findlay as the
company's contact, Wong as the president of both International
Energy and SAT, and a Boock telephone number.  The TAVF filed in
August 2005 for El Apparel indicated that Wong was president of
SAT and listed one of Wong's telephone numbers as the contact
number for the company.  A note on the El Apparel form by a
NASDAQ employee indicated that she called the company number and
spoke with Wong, who answered that number.  The Marinas
International TAVF filed in August 2005 also listed Wong as the
president of SAT.  Shortly after approving a name change and
reverse stock split for LeaseSmart in October 2005, NASDAQ
received a complaint from an individual claiming to be the true
owner of LeaseSmart.  After investigating the complaint, NASDAQ
discovered that Wong was listed as CEO of the Hijacked
Corporation in a form filed in July 2005 and that SAT was the
transfer agent.  In addition, Wong was listed as an officer of
International Energy and as a registered agent for Lotta Energy
and Grand Lux in files provided to NASDAQ along with TAVFs.

    Throughout these documents are aliases which Boock and/or
DeFreitas have admitted were used by the Defendants as part of
the Scheme.  In addition, these documents listed addresses

associated with either Boock and Wong, or DeFreitas.  Other than
the request for El Apparel, which listed Wong's cell phone
number, the NASDAQ filings listed one of Boock's telephone
numbers.

By January 2006, NASDAQ had assigned Wong a red flag
because he had exhibited a pattern for reinstating dormant
companies and assuming their corporate identities.  NASDAQ
employees also found it odd that Wong was listed as both an
officer of the companies requesting new symbols and as president
of SAT, the transfer agent for those companies.

D. Dealing with Clients Interested in Shell Deals

Boock, DeFreitas and Wong also coordinated by email on
dealing with clients who were interested in shell deals -- deals
in which their companies would be merged into previously dormant
public companies.  Wong corresponded directly with third parties
about shell deals.  Two witnesses -- one a potential client and
one a stock promoter that performed services for Wong --
testified that Wong contacted them about a shell deal involving
KSW Industries.  In 2003 or 2004, Wong and DeFreitas met a
business consultant at a trade show in New York and spoke to him
about shell deals.

Again, emails show Wong's involvement in the sales of
shells to interested private companies.  In October 2004, Wong
corresponded with DeFreitas about a client's return of shell

companies.  Boock wrote to a client in May 2005 indicating that
Wong would arrange initial financing for a potential KSW
Industries shell deal.  An email from Boock to Wong in September
2005 directed Wong to offer an unnamed shell company for
$150,000.

     Boock testified Wong was involved in the sale of the Baker
Communications shell, and Wong's email communications support
this testimony, showing that he was in contact with the shell
purchaser and set terms for the closing.  Wire instructions
given to an agent involved in the sale indicated that $105,000
was to be deposited in the account of 1606884 Ontario, a Wong-
controlled company, and the bank records of that entity indicate
that it did indeed receive a transfer of $104,970 at the time of
the sale of Baker Communications.  Wong denies that "Baker
Communications was a shell that [he] sold" but does not deny
that he was aware that it was a dormant shell company.

     E. Issuing Shares For the Hijacked Public Companies

     Wong also played a role in printing the shares for the
Hijacked Corporations which, among other things, were used to
compensate Boock, DeFreitas and Wong himself as part of the
Scheme.  In October 2005, SAT hired an employee, Allie, who had
no experience in securities or with a transfer agency like SAT.
Wong taught her how to print stock certificates and how to
either use a signature stamp or forge by hand the signature of

Amy Giles, the purported president of SAT after Wong left that
position.[3]  Wong returned to SAT several times after Allie's
first day in October 2005 and advised her on how to handle
requests for stock certificates to be printed.  Allie would
receive requests for printing shares by fax followed by a
telephone call from someone claiming to represent the issuing
company, and Allie subsequently would send out printed
certificates by FedEx.  Allie referred questions from investors
to Wong and DeFreitas.  Her duties were based on what she had
been taught by Wong and, to a lesser extent, DeFreitas.  SAT
issued stock certificates for some of the Hijacked Corporations,
including Caribbean Developments and KSW Industries.

Wong maintained personal involvement with share issuances
in late 2005 and early 2006.  Boock directed DeFreitas and Wong
by email to issue shares to certain shareholders of Big Hub, in
August 2005.  On September 28, 2005, Wong requested by email
that DeFreitas issue a certificate for 100,000 shares of KSW
Industries to stock promoter Tony Golden ("Golden").  On January
16, 2006, Wong emailed DeFreitas asking that he issue a million
shares of "EL" to his account and a million shares of "LS" to an
account of 1606884 Ontario, a company Wong owned.  Indeed,

---

[3]      There is no evidence that Amy Giles is an existing person.
Allie testified that she never spoke to or interacted with
Giles.  DeFreitas testified that Giles was an alias for the
Defendants.

Wong's 1606884 Ontario's trading account records show that he received one million shares of El Apparel on January 20, 2006 and one million shares of LeaseSmart on February 1, 2006.  Wong later emailed Boock in February 2006 for advice on the issuance of shares for Baker Communications.

F. Creating a Market by Promoting the Shares of the Hijacked Companies

Wong had a significant role in creating a market for the newly-issued shares of Hijacked Corporations by drafting, editing, and issuing press releases.  On March 13, 2005, Wong emailed different versions of draft press releases for Grand Lux to DeFreitas that included a Boock telephone number and the address of the Orlando Post Box associated with Boock and Wong.  Similarly, Wong sent DeFreitas and/or Boock draft press releases or other promotional language for Caribbean Developments in July (and possibly September) 2005, for KSW Industries in September 2005, and for El Apparel in November 2005.

Wong admits that he forwarded a press release for KSW Industries to a stock promoter, Mark Moline ("Moline").  Moline testified that Wong also worked with him to promote Big Hub, LeaseSmart, El Apparel, Global Aerial Surveillance, Inc., Caribbean Developments, Grand Lux, Transworld Oil and Gas Ltd., Magellan Energy and International Energy.  Moline edited these press releases but did not draft them himself.  He always worked

with Wong, and never had contact with any third person who worked for these companies.  Moline billed Wong for these services.

Wong also worked with an investor relations professional, Golden, whose Georgia-based company, Shareholder Development Group, distributes press releases for companies traded on the OTC Pink Sheets of the OTC Markets Group, a major interdealer quotation system on which market makers of a security post "bid" and "ask" quotes.  Wong referred KSW Industries and Caribbean Developments to Golden.  In working with Golden, Wong does not dispute that he used a telephone number and email address which were used in other communications related to the Scheme and on some of the Hijacked Corporations' filings with the NASDAQ.

III. Wong Received and Sold Shares of the Hijacked Corporations

Wong received shares of the Hijacked Corporations and liquidated them soon thereafter.  Through Royal Bank of Canada trading accounts under his name or JWV and 1606884 Ontario, companies he owned, Wong deposited or purchased and sold shares for various Hijacked Corporations within the date ranges and in the quantities specified in the below table.

| Hijacked Corporation | Number of Shares | Date Acquired | First Date Sold | Last Date Sold |
|---|---|---|---|---|
| Asia Telecom | 1,800,000 | 10/20/2006 | 11/28/2006 | 1/25/2007 |
| Big Hub | 1,900,000 | 8/22/2005 | 8/26/2005 | 1/9/2006 |
| Caribbean Developments | 100 | 4/18/2005 | Before 4/29/2005 | Before 4/29/2005 |
| Cavico | 100,000 | 9/16/2006 | 9/21/2006 | 10/18/2006 |

| Baker Communications | 79 (after reverse stock split) | 4/6/2006 (date of reverse stock split) | 4/26/2006 | 4/26/2006 |
|---|---|---|---|---|
| El Apparel | 1,000,000 | 1/20/2006 | 1/26/2006 | 3/22/2006 |
| Grand Lux (First Acquisition) | 13,725 | 3/18/2005 | n/a | n/a |
| Grand Lux (Second Acquisition) | 1,000 | 3/18/2005 | n/a | n/a |
| International Energy (First Acquisition) | 1,800,000 | 10/13/2006 | 12/1/2006 | 12/6/2006 |
| International Energy (Second Acquisition) | 1,200,000 | 12/8/2006 | 12/14/2006 | 12/22/2006 |
| KSW Industries[4] (First Acquisition) | 1,550 | 3/29/2005 | 4/5/2005 | 4/5/2005 |
| KSW Industries (Second Acquisition) | 2,500,000 | 6/6/2005 | 6/13/2005 | 9/8/2005 |
| LeaseSmart | 1,000,000 | 2/1/2006 | 2/7/2006 | 3/22/2006 |
| Microlink Solutions | 1,800,000 | 10/13/2006 | 2/23/2007 | 2/26/2007 |

[4]     Wong seems to suggest that the SEC has provided no evidence that KSW Industries was a successor of KDW Telecom Inc., and by extension, that KDW Telecom Inc. has any relation to Kay Merchandising International Ltd.  This is not true.  Testimony by DeFreitas confirmed that Kay Merchandising International Ltd. was succeeded by KDW Telecom Inc., which in turn was succeeded by KSW Industries.  Wong has not offered any evidence to contradict that testimony.  Furthermore, although Wong asserts in his reply in support of his summary judgment motion, and without any supporting evidence, that he was a shareholder of KDW Telecom "long before any alleged misconduct occurred," he did not dispute the information reflected in this chart that Wong acquired and sold shares of this company's stock in the same timeframe as other Hijacked Corporations.

None of these securities (the "Wong-Sold Securities") for these eleven companies (the "Wong-Sold Companies") were registered with the SEC.

Boock often was compensated for his part of the Scheme by DeFreitas or Wong who would split proceeds they received with him. On at least seven occasions, Wong received funds from Shoss and within six days wired approximately fifty percent of that amount to Boock.[5]

IV. Procedural History

The SEC filed the complaint in this action on September 9, 2009. The complaint lists claims of violations of the federal securities laws against the Defendants in addition to naming Birte Boock ("Birte Boock"), the wife of Boock, and 1621566 Ontario, Inc. as relief defendants. On October 26, Wong filed a motion to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P. The Court denied this motion at the initial pretrial conference held on January 29, 2010.

On March 26, 2010, this Court entered a default against Boock, Birte Boock, DeFreitas and 1621566 Ontario, Inc., as none had answered or otherwise responded to the complaint and summons served on them. The case was referred to Magistrate Judge Debra

---

[5]     Wong claims that these payments to Boock were repayments for loans made to him by Boock or his wife but provides no documentary evidence for this assertion, nor does he provide an alternate explanation for the timing or amounts of these transfers.

Freeman to conduct an inquest as to damages.  On June 15, the Court entered an order staying this action with regard to Loisel and Shoss pending the criminal proceedings against them.  On June 21, the SEC filed a Proposed Findings of Fact and Conclusions of Law Concerning Damages as to the defaulting defendants.  Then, on October 20, Boock and Birte Boock, acting pro se, filed affirmations which Magistrate Judge Freeman construed as motions to set aside the entry of default against them.

On February 14, 2011, this Court granted the SEC's request to continue efforts to depose Birte Boock after its first attempt earlier this year was unsuccessful and the scheduled date for the end of discovery had passed.  This deposition took place on March 29, but Birte Boock did not supply certain account information as requested in the subpoena.  This Court issued an order on April 26 that Birte Boock execute and serve on the SEC releases that would permit the SEC to obtain this information directly from the financial institutions hosting her accounts.  Although Birte Boock executed these releases, she and Boock then proceeded to interfere with the SEC's efforts to obtain the account information and failed to comply with this Court's May 6, May 11 and May 18 orders to cure this interference.  On May 20, this Court found Birte Boock and Boock in contempt of court.  At a hearing of June 1, Birte Boock and

Boock were represented by counsel, who represented that his
clients intended to cooperate fully with the plaintiff's efforts
to access Birte Boock's account records from the remaining
banks.  By order dated June 2, Boock and Birte Boock's motions
to set aside their respective defaults were denied.  The SEC
reported to the Court on June 9, indicating that the production
of account records from the banks was still ongoing and that it
had not yet been able to confirm that all the banks would comply
with the releases executed by Birte Boock.

On February 25, 2011, the SEC filed a motion for summary
judgment as to Wong.  On the same day, Wong filed a cross-motion
for partial summary judgment.  These motions were fully
submitted on April 6.  The SEC then filed a motion to strike
certain portions of Wong's reply in support of his motion for
partial summary judgment on April 14.  This motion was fully
submitted on April 28.

On March 15, 2011, this Court granted the SEC's request to
serve a further document request on Wong as information
disclosed late in the discovery period by the depositions of
DeFreitas and Boock revealed information about accounts the SEC
alleges Wong had not previously disclosed to the SEC.  After
Wong refused to supply information to the SEC about these
accounts, this Court ordered Wong on May 3 to execute and serve
on the SEC releases that would permit the SEC to obtain this

information directly from the financial institutions hosting his accounts.  In a letter dated May 19, Wong informed the Court that he complied with this order.

DISCUSSION

The SEC argues that it is entitled to summary judgment because the undisputed facts show that Wong participated in the Scheme and, in connection with that Scheme, offered and sold shares of the Hijacked Corporations in violation of both antifraud provisions and the registration requirements of the federal securities laws.  Wong, on the other-hand, contends that he is entitled to partial summary judgment because there is no evidence of illegal gains from sales of stock of allegedly hijacked entities and all his transactions involving stock of the companies at issue were covered by an exemption from registration under the federal securities laws.  Because Wong has not raised any genuine disputes of material fact to counter the evidence that supports the SEC's claims, and because his motion is based largely on assertions unsupported by admissible evidence, the SEC's motion for summary judgment is granted in part and Wong's motion is denied.

I.   Summary Judgment Standard

A motion for summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); see El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); El Sayed, 627 F.3d at 933. When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot "merely rest on the allegations or denials" contained in the pleadings. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). That is, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Only disputes over material facts -- facts that might affect the outcome of the suit under the governing law -- will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009).

II.  Disputes as to the Evidence in the Record

    Both parties assert that various exhibits relied upon by
the opposing party in the motions for summary judgment and
opposition papers should not be considered by this Court for the
purposes of summary judgment as they are not admissible.
"[O]nly admissible evidence need be considered by the trial
court in ruling on a motion for summary judgment." Presbyterian
Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d
Cir. 2009) (citation omitted).  "A district court deciding a
summary judgment motion has broad discretion in choosing whether
to admit evidence." Id. (citation omitted).  All arguments that
a fact either cannot be or is genuinely disputed must be
supported by either admissible evidence in the record or a
showing that the adverse party cannot produce admissible
evidence to support its position.  Fed. R. Civ. P. 56(c).

    "The principles governing admissibility of evidence do not
change on a motion for summary judgment." Presbyterian Church,
582 F.3d at 264 (citation omitted).  Admissible evidence may be
introduced through affidavits or declarations that "are made on
personal knowledge, set out facts that would be admissible in
evidence, and show that the affiant or declarant is competent to
testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  But
a party may also cite to other "materials in the record" to
support its assertions.  Fed. R. Civ. P. 56(c)(1)(A) (emphasis

24

supplied).  The Federal Rules of Evidence require that materials submitted for acceptance into the record be authenticated or self-authenticating, Fed. R. Evidence 901 & 902, and non-hearsay, Fed. R. Evidence 802.

Similarly, parties may object to the introduction of documents or other evidence that was not disclosed during discovery pursuant to Rule 26 of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 37(c).  Preclusion of such evidence is not automatic under Rule 37(c); in deciding whether to preclude evidence not previously disclosed a court may consider "(1) the party's explanation for the failure to comply with the [disclosure requirement, including the possibility of bad faith]; (2) the importance of the [precluded evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance."  Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006) (citation omitted).  Furthermore, the language of Rule 37(c) is clear that a court need not preclude evidence if the failure to disclose "was substantially justified or . . . harmless" and may choose to order another sanction in addition to or instead of preclusion of the previously undisclosed evidence.  Fed. R. Civ. P. 37(c).

A. Challenges Brought by the SEC Against Wong's Evidence

1. Inadmissible Hearsay or Unauthenticated Documents

The SEC argues that various documents offered by Wong[6] are inadmissible because they are hearsay and, in addition, are not introduced by an affidavit made on personal knowledge or otherwise authenticated in order to support their introduction as evidence.  Wong did not produce many of these documents to the SEC during the discovery period and it therefore had no opportunity to depose Wong about them.  Wong has not explained how or when they came into his possession and the SEC argues that they are fabricated.

Wong's disputed documents include a) share purchase agreements[7] and b) a purported subscription agreement and an attorney opinion letter related to Wong's acquisition of shares of Cavico.[8]  Wong has not authenticated these documents by any

---

[6]    These documents were attached to Wong's statement of uncontroverted facts pursuant to Local Rule 56.1 in support of his motion for partial summary judgment, his reply brief in support of partial summary judgment, and his statement of controverted facts supporting his opposition to the SEC's motion for summary judgment.

[7]    These exhibits are attached to Wong's principal brief in support of his motion for partial summary judgment as Exhibits 2 through 7 and 12, and to his opposition brief to the SEC's summary judgment motion as Exhibits 21-26 and 31.

[8]    These are attached to Wong's reply brief in support of his motion for partial summary judgment as exhibits 25 and 26. Several other exhibits that Wong attaches to his briefs in support of his motion and in opposition to the SEC's motion are

means provided in Federal Rule of Evidence 901, for example, through an affidavit by someone with personal knowledge that the documents are what they are purported to be.  Nor are they self-authenticating under Federal Rule of Evidence 902.  Other than as described below, Wong has also not made an argument that these documents are non-hearsay; on their face no exceptions available under Rule 803 apply.  They are not admissible and are excluded from the summary judgment record.

Wong does not directly address the SEC's argument that the purported share purchase agreements are inadmissible.  Instead, Wong argues in a footnote that the SEC waived its objection to one of those share purchase agreements because it did not raise its objection earlier.  The SEC had, however, objected to the class of documents to which this exhibit belongs in its reply brief in support of its summary judgment motion.

Wong argues that the documents purportedly related to his acquisition of Cavico securities are not hearsay because they are "verbal acts" as statements that "give rise to legal consequences."  The "verbal acts" exception to the hearsay rule does not apply here because these documents are being presented not as proof of their own existence, but rather for the truth of

---

similarly unauthenticated and possibly hearsay.  By failing to raise objections as to these other exhibits, however, the SEC has waived any objection to their admissibility on summary judgment.

the contents of those documents.  United States v. Cardascia,
951 F.2d 474, 486-87 (2d Cir. 1991).  After all, Wong relies on
these documents to show that the transactions described in them
actually took place, thereby exempting his acquisition from the
registration requirements of Section 5.  Furthermore, even if
these documents were "verbal acts" evidence, Wong does not
address the inadmissibility of these documents due to their lack
of authentication.

      B. Challenges Brought by Wong Against the SEC's Evidence

          1. Challenges Related to Rule 26 Disclosure Obligations

     Wong asks that several of the SEC's exhibits be stricken
because they were not disclosed during the discovery period.
His request is denied.  Wong challenges the certified
attestations of the Secretary of the SEC confirming the
existence or absence of registration statements for various
companies.[9]  Wong argues that because the SEC did not disclose
any SEC records officer as part of its initial disclosures these
documents should be precluded.  It was plain from the complaint
that the SEC alleged that Wong's securities transactions
violated the registration requirements of the federal securities
laws, and specifically alleged that Wong sold "securities as to
which no registration statement was in effect."  Wong was

---

[9]    Attached as Exhibit S to the SEC's summary judgment motion.

therefore apprised even before the start of discovery that the SEC would introduce evidence of an absence of registration statements.  Significantly, Wong does not argue that the securities he sold were actually registered.

Wong also makes a vague challenge to the introduction of the Declaration of Mark Johnson ("Johnson")[10] because Johnson was not a witness disclosed in the SEC's initial disclosures.  The testimony of Johnson, a business consultant who helped match a client with Wong in order to arrange a shell deal wherein the client company would be merged with Baker Communications, was offered to impeach Wong's assertion in his opposition to the SEC's summary judgment motion that he did not sell the Baker Communications shell company.  Rule 26 explicitly provides that a party may introduce testimony not disclosed pursuant to Rule 26 if it is used solely for impeachment.  Rule 26(a)(1)-(2), Fed. R. Civ. P.

Wong complains that the supplemental report of James M. Cangiano ("Cangiano")[11] should also not be introduced into evidence as it was not produced prior to the end of discovery. Cangiano's supplemental report was produced no later than February 25, 2011, pursuant to the SEC's obligations under Rule

---

[10]   Attached to the SEC's reply in support of its summary judgment motion as Exhibit 7.

[11]   The second portion of Exhibit T attached to the SEC's summary judgment motion.

26(e) to supplement an expert report when new information is brought to the party's attention making the original report incomplete or incorrect.  This Court had permitted additional discovery to take place after the previously-set date for the end of fact discovery, including depositions on December 10, 2010 and January 13, 2011, and Cangiano's supplemental report addresses that additional discovery.  In any event, the supplemental report only reaffirms the conclusions of Cangiano's initial report.[12]

2. Challenges to the Authenticity of Documents

Wong also challenges a large portion of the SEC's evidence as documents that are forgeries or otherwise fraudulent.  First, he claims that all of the emails produced by DeFreitas (the "DeFreitas Emails") are fabricated, and that in his deposition, DeFreitas lied when authenticating his emails.[13]  DeFreitas testified that he printed out all the relevant emails within the time period at issue and then scanned them to a "pen drive" for

---

[12]    In so far as Wong's vague objection to the supplemental report of Natalie A. Lentz, attached to the SEC's reply in support of its summary judgment motion as Exhibit 8, referenced briefly in his opposition to the SEC's motion to strike, is based on the same argument, the reasoning for admitting the Cangiano supplemental report holds equally true for the Lentz supplemental report.

[13]    These emails are attached as parts of the SEC's Exhibit B to its summary judgment motion, Exhibit 3 to its reply in support of its summary judgment motion and Exhibit 6 to its opposition to Wong's summary judgment motion.

his counsel.  Wong contends that DeFreitas must have produced
his emails in this manner to strip out metadata, thereby hiding
evidence that they are false.  Wong argues that the missing
metadata would support his contention and that it has been
denied to him.  But, Wong has not shown that he ever made a
targeted request for electronic copies of the emails that would
include the metadata, nor did Wong request help from the Court
in resolving a discovery dispute on this issue.[14]  In fact,
Wong's counsel was informed by DeFreitas's counsel that he might
be able to obtain the emails with metadata from DeFreitas's
email service provider.  There is no evidence that Wong has
attempted to secure the metadata through the email service
provider or has been blocked from doing so.  Therefore, there is
no indication that Wong has been prevented from obtaining
discovery that could support his theories about the authenticity
of the DeFreitas Emails.

      Other than this speculation about metadata, Wong has not
pointed to anything that undermines the authenticity of the
DeFreitas Emails.  Neither Boock nor Wong have produced their
own emails from the period.  Wong claims that Boock and a third
party, Gregory Roberts ("Roberts"), have testified that these

---

[14]    Wong's counsel sought a copy of DeFreitas's entire hard
drive, a request to which DeFreitas objected.

emails are forgeries, but this is either an exaggeration or a
misstatement of the evidence.

Boock admitted at his deposition that several of the emails
were ones he sent or received, including emails sent or received
by Wong.  Even for some emails that he did not recall, he
testified as to the accuracy of their contents by agreeing that
the communications reflected actions or discussions he
remembered taking place.  In fact, Wong did not identify and
provide to the Court any excerpt of Boock's testimony in which
Boock questioned the accuracy of the DeFreitas Emails or
suggested they were forgeries.

The testimony of Roberts is that two letters, purportedly
on his letterhead and attached to an email sent by Boock that is
part of the DeFreitas Emails production, were forgeries.  To
support this contention, Roberts stated that one of these
attached letters included his former address but a telephone
number that is registered to Boock.  His testimony does not
question the accuracy of the DeFreitas Emails themselves, but
rather suggests that Boock actually sent one of the DeFreitas
Emails, attached to which was a letter forged by one of the
Defendants using Roberts's name as part of the Scheme.

Finally, Wong purports to rely on his own deposition
testimony to raise a question about the authenticity of the
DeFreitas Emails.  But, Wong's briefs do not point to any

32

specific passages of his own testimony for this purpose.  A
review of the passages provided to the Court shows that Wong did
not remember receiving any emails produced by DeFreitas and
shown to him at the deposition, although he did remember some of
the events reflected.  Nowhere in the transcript passages does
Wong explicitly question the authenticity of the documents,
although Wong noted that he observed some "oddities," such as
emails missing headers, and speculated that Boock and DeFreitas
were sending emails in his name.  In the face of authenticating
testimony by DeFreitas and other witnesses who testified about
this evidence, this is insufficient to exclude the DeFreitas
Emails from the record.  This evidence provides an adequate
showing of admissibility because "sufficient proof has been
introduced so that a reasonable juror could find in favor of
authenticity."  United States v. Al-Moayad, 545 F.3d 139, 173
(2d Cir. 2008) (citation omitted).

> 3. Wong's Argument that Certain Evidence Be Disregarded
>    as Forgeries or the Product of Identity Theft

Finally, Wong argues that other documents that the SEC has
offered -- filings with the various secretaries of state, NASDAQ
and CUSIP Services ("Filed Documents") -- are forgeries and
therefore should be disregarded by the Court.  To be clear, Wong
does not contest the authenticity of these documents; he does
not question that these exhibits are what the SEC purports to be

-- documents that were actually submitted to secretaries of states, NASDAQ and CUSIP Services.  Rather, he argues that the Filed Documents containing either his name or his signature were not submitted by him and are the product of identity theft.  In doing so, Wong proffers a theory that is unsupported by any evidence, at odds with a significant amount of admissible evidence, and implausible on its face.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Moreover, bald allegations of forgery unsupported by facts of record are insufficient to create issues of material fact. Nieves v. Hess Oil Virgin Islands Corp., 819 F.2d 1237, 1252 (3d Cir. 1987) (not error to disregard allegation of forgery).  As a result, Wong's effort to preclude consideration of some of the most compelling evidence of his role in the Scheme will not prevent entry of summary judgment against him.

To begin with, Wong claims in his briefs that he was a victim of identity theft who never intended or realized that he was caught up in a scheme to hijack public companies, sell them as shells, and sell their stock.  But, there is no testimony from Wong under oath in either a deposition or an affidavit

34

stating he was the victim of identity theft.  Wong also does not present any testimony from third-parties, such as a credit card company, utility, business associate, friend or family member that could corroborate his argument that his identity was stolen for the purpose of executing the Scheme or for any other purpose.

Lacking any testimonial evidence in support of his identity theft story, Wong attaches to his briefs a copy of his driver's license and a resignation letter in order to show that the signature on those documents is different from the one present on some of the Filed Documents.  Assuming that these two documents, neither of which are authenticated, provide a true representation of Wong's signature, they are still not persuasive evidence that Wong did not submit or sign the Filed Documents.  First, even if the differences between the signature on the license and letter and the signature on some of the Filed Documents, were sufficient to raise a question of fact as to whether Wong himself signed his name on those Filed Documents that have a signature, the majority of the Filed Documents were submitted electronically or did not require a handwritten signature.[15]

---

[15]    Wong also argues that "knowledgeable witnesses" had testified that the signatures on some of the Filed Documents are not his and that Boock and DeFreitas testified that they did not know if Wong filed documents with secretaries of state, NASDAQ

Second, the license and letter are not sufficient to show
that even those Filed Documents with a handwritten signature
were not filed by Wong.  The SEC has presented copious evidence
that Wong worked closely with the other Defendants in a complex
scheme designed to confuse those trying to detect fraud.  Wong
admits to being in very frequent communication with the other
Defendants at the time of the Scheme, to serving as the CEO,
president and sole director of the transfer agency that was at
the heart of the Scheme, and to receiving and quickly selling
shares in many of the Hijacked Corporations.  Admissible
evidence in the form of testimony by other Defendants, emails
Wong sent and received, and telephone and credit card records,
all provide evidence of Wong's knowledge of, and active
participation in the Scheme.

Moreover, some of the Filed Documents list addresses or
telephone numbers that Wong has either admitted to using or that
have been connected to Wong through other admissible evidence.[16]

---

or CUSIP services, but points to nothing in the record to
support that assertion.

[16]   Although Wong alleges that the Orlando Post Box address
listed on many of the Filed Documents was not his, he received
mail at that address.  Boock testified that Wong received mail
there, qualifying his statement only to state that Wong did not
receive much "personal" mail there.  The declaration of the
former manager of the UPS store where the Orlando Post Box was
located, which Wong has submitted, only suggests that either
Boock picked up mail for him or that the mail was forwarded to
Wong or Boock at another address.  Similarly, the affidavit of

It strains credulity, and no reasonable jury could find, that an identify thief would use Wong's name in submitting corporate documents for the Hijacked Corporations to secretaries of state and regulatory authorities and yet include Wong's true contact information.  Using Wong's contact information would create the risks that any identity thief might fail to receive information that might be integral to carrying out the Scheme should the offices receiving the Filed Documents reach out to Wong with queries or confirmatory communications, and that Wong would discover the theft of his identity to perpetrate a fraud.  Therefore, rather than suggesting identity theft, any evidence of differing signature styles suggests as easily that Wong may have authorized others to sign his name on some of the Filed Documents, or that he altered his signature for documents related to the Scheme -- two alternatives consistent with both the bulk of the evidence and any differences in Wong's various signatures.

Wong's theory of identity theft can be disregarded for at least one additional reason.  The only individuals who could have used Wong's identity to create and send the Filed Documents

---

Craig Gallacher, a senior investigator of the Ontario Securities Commission, suggests that one of Boock's roles in the Scheme was to pick up mail from that box.  Neither declaration tends to show that Wong was not connected to the Orlando Post Box, as he argues.  Wong therefore cannot rely on these declarations to disclaim association with the Orlando Post Box address.

were his friends DeFreitas and Boock, who have already admitted their own roles in the Scheme.  If stolen, Wong's identity was stolen to file corporate documents for Hijacked Corporations whose stock Wong purchased or received at the time of the Scheme, and quickly resold.  Wong therefore asks that one believe, in the absence of almost any evidence, that his identity was stolen by his friends and business associates, with whom he still is on good terms, and in order to accomplish ends that directly benefited him.  No reasonable jury could believe this in the face of the overwhelming contrary evidence.

III. Section 5 Liability for Selling Unregistered Securities

        The SEC seeks summary judgment on its claim against Wong for violations of Section 5.  Wong's principal defenses rely on the exemptions in Section 4(1), 15 U.S.C. § 77d(1), and Regulation S, 17 C.F.R. §§ 230.901-05.  The SEC has shown that it is entitled to summary judgment on its Section 5 claim, but not in connection with every security for which it seeks to hold Wong liable.

        The securities at issue in the Section 5 claim include the Wong-Sold Securities, which Wong himself acquired and sold through accounts under his name or the name of a company he controlled, as well as other securities which the SEC alleges were part of the Scheme but which Wong himself did not acquire and sell through his own accounts.

Section 5(a) provides in pertinent part

(a)  Unless a registration statement is in effect as
     to a security, it shall be unlawful for any
     person, <u>directly or indirectly</u> -
     (1)  to make use of any means or instruments of
          transportation or communication in
          interstate commerce or of the mails to sell
          such security through the use or medium of
          any prospectus or otherwise; or
     (2)  to carry or cause to be carried ... any such
          security for the purpose of sale or for
          delivery after sale.

15 U.S.C. § 77e(a) (emphasis supplied).  Section 5(c) makes it

"unlawful for any person, directly or indirectly, to make use of

any means or instruments of transportation or communication in

interstate commerce or of the mails to offer to sell" a security

"unless a registration statement has been filed as to such

security."  15 U.S.C. § 77e(c).  A sale includes "every contract

of sale or disposition of a security or interest in a security,

for value."  15 U.S.C. § 77b(a)(3).  An offer to sell securities

includes "every attempt or offer to dispose of, or solicitation

of an offer to buy, a security or interest in a security, for

value."  <u>Id.</u>

     The purpose of the registration requirement, and of the

Securities Act as a whole, is to "protect investors by promoting

full disclosure of information thought necessary to informed

investment decisions."  <u>SEC v. Ralston Purina Co.</u>, 346 U.S. 119,

124 (1953).  Section 5 requires issuers of securities to

disclose, among other things, information about the issuers'
financial condition, the identity and background of management,
and the price and amount of securities to be offered.  15 U.S.C.
§§ 77g, 77aa.

> A.   Prima Facie Case for Liability

"Section 5 requires that securities be registered with the
SEC before any person may sell or offer to sell such
securities." SEC v. Cavanagh, 445 F.3d 105, 111 (2d Cir. 2006)
("Cavanagh II").  "To state a cause of action under Section 5,
one must show (1) lack of a registration statement as to the
subject securities; (2) the offer or sale of the securities; and
(3) the use of interstate transportation or communication and
the mails in connection with the offer or sale." Id. at 111
n.13 (citation omitted).  The SEC need not show scienter to make
its prima facie case for Section 5 liability.  Aaron v. SEC, 446
U.S. 680, 714 n.5 (1980).  "Once a prima facie case has been
made, the defendant bears the burden of proving the
applicability of an exemption." Cavanagh II, 445 F.3d at 111
n.13.

> 1.   Lack of Registration

Certifications with official seals from the SEC, as well as
the testimony of the SEC's expert investigator, confirm that
there were no securities registrations for the following Wong-
Sold Companies between November 1, 2003 and June 30, 2007: Asia

40

Telecom, Big Hub, Cavico, Baker Communications, International
Energy, KSW Industries, LeaseSmart, Microlink Solutions, El
Apparel, Caribbean Developments and Grand Lux.  In addition,
there were no registrations for securities in that time period
for the following Hijacked Corporations: PCC Group, AEI
Transportation, Alcan Chemicals, Bicoastal Communications,
Inolife Pharma, Level Vision, Lotta Energy, Magellan Energy,
Marinas International, TCPI, Natural Medicines, and United
Environmental Energy.

        2.  Sales of the Unregistered Securities

            a. Sales by Wong

    Wong does not deny that he sold the Wong-Sold Securities.
In fact, he concedes that he completely liquidated these
securities shortly after acquiring them -- often within a week.
The longest he held on to any of the shares of the Hijacked
Corporations was less than five months.  Therefore, as to the
Wong-Sold Securities, there is no dispute that the SEC has
proven this element of its Section 5 violation claim.

            b. Wong's Participation in Sales by Others

    The SEC alleges that Wong is also liable under Section 5
for the sales by other Defendants of all the unregistered
securities sold as part of the Scheme because he was a
"necessary participant" or "substantial factor" in those sales.
Drawing upon the statutory language in Section 5, which imposes

liability on persons who "directly or indirectly" engage in the acts forbidden by that section, the Court of Appeals for the Second Circuit concluded many decades ago that liability under Section 5 extends beyond those who sell stock to all necessary participants in a sale of unregistered stock.  See <u>SEC v. Universal Major Indus.</u>, 546 F.2d 1044, 1046 (2d Cir. 1976) (finding liability for individual who was "indispensable" to another's sale of stock); <u>SEC v. Chinese Consol. Benev. Ass'n Inc.</u>, 120 F.2d 738, 741 (2d Cir. 1941) (Liability for violations of Section 5 extends to those who have "engaged in steps necessary to the distribution of [unregistered] security issues.").  The necessary participant test recalls the first part of a proximate cause analysis; "it essentially asks whether, but for the defendant's participation, the sale transaction would not have taken place."  <u>SEC v. Murphy</u>, 626 F.2d 633, 651 (9th Cir. 1980).[17]  Federal securities regulations

---

[17]   In <u>Pinter v. Dahl</u>, 486 U.S. 622 (1988), the Supreme Court rejected the idea that an individual could be liable as a "necessary participant" and "substantial factor" in the sale or offer of an unregistered security under Section 12 of the 1933 Act, which creates a private cause of action for Section 5 violations.  <u>Id.</u> at 648-54.  Section 12 specifies that "[a]ny person who (1) offers or sells a security in violation of [Section 5] . . . shall be liable . . . to the person purchasing such security <u>from him</u>."  15 U.S.C. § 77l(a) (emphasis added).  Focusing on the phrase "from him" in Section 12, the Supreme Court found that the "necessary participant" or "substantial factor" test was not consistent with this "purchase from" requirement.  <u>Id.</u>  Section 5, on the other hand, contains no language similar to the "from him" language of Section 12.

would be frustrated if "those who assisted the principal wrongdoers out of friendship or other non-pecuniary motives . . . were held to be beyond the scope of regulation by the courts." SEC v. North Am. Research & Dev. Corp., 424 F.2d 63, 81 (2d Cir. 1970).

The SEC argues that Wong was a substantial factor and necessary participant in the sales of the securities of Hijacked Corporations beyond the Wong-Sold Securities because of his involvement in the Scheme, specifically: finding private parties as clients for shell deals; filing paperwork with state secretaries of state, NASDAQ and CUSIP Services; serving as the president, CEO and director of the transfer agent, SAT; and handling the promotion of stock.[18]  Conducting these functions

---

Therefore, Pinter does not overrule the case law finding that the SEC can demonstrate liability under Section 5 when it shows a defendant is both a "necessary participant" and "substantial factor" in the sales transaction.  SEC v. Phan, 500 F.3d 895, 906 n.13 (9th Cir. 2007).

[18]    In fact, pursuant to the definition of "offer" in the statute, Wong's involvement in stock promotion of several of the Hijacked Companies could create liability as a direct offeror of unregistered securities, not simply as a "necessary participant" in the sale of those securities.  15 U.S.C. § 77b(a)(3) ("The term "offer to sell", "offer for sale", or "offer" shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value."); see also Pinter, 486 U.S. at 643 (finding that pursuant to Section 77b(a)(3), "the range of persons potentially liable under" the provisions of the securities laws using the word "offer" "is not limited to persons who pass title"; rather, it also includes "an individual who engages in solicitation, an activity not inherently confined to the actual owner").

for the Hijacked Corporations was necessary to the distribution of their unregistered securities -- without them, the Defendants would not have had control of the companies or have found a market to which they could sell securities as part of the Scheme.  "[A] reasonable fact finder could conclude that [these activities] were necessary to and substantial factors in the unregistered offerings."  SEC. v. Czarnik, No. 10 Civ. 745 (PKC), 2010 WL 4860678, at *12 (S.D.N.Y. Nov. 29, 2010) (finding that Section 5 was violated by an individual who, among other things, "help[ed] the Issuers complete reverse mergers into formerly publicly traded shells . . . work[ed] to obtain a NASDAQ ticker symbol for each of the Issuers . . . draft[ed] and fil[ed] rudimentary disclosures for each Issuer with Pink Sheets[,] . . . [and] transferr[ed] the above documents to the Issuers' transfer agents.")

But the SEC has not presented evidence that Wong conducted these activities with respect to all of the securities of the Hijacked Corporations that were not Wong-Sold Securities.  It has made this showing as to only four:

- Boock emailed Wong in September 2005 with the website address for Marinas International, indicating that he hoped that they had ownership of the company in order to "get it up and running."  Later, Wong requested or authorized another to request in his name new CUSIPs from CUSIP Services for Marinas International.  In August 2005, a TAVF filed by SAT on behalf of Marinas International listed Wong as president of SAT.

- Wong requested or authorized another to request in his name new CUSIPs from CUSIP Services for Alcar Chemicals.
- Wong requested or authorized another to request in his name new CUSIPs from CUSIP Services for PCC Group.
- Wong referred Magellan Energy to stock promoter Mark Moline, who drafted press releases for it.

Wong does not contest that he was a "necessary participant" in the sale of the unregistered securities of these four Hijacked Corporations.[19]  Therefore, although he did not sell the securities themselves, no reasonable fact finder could find that Wong was not a "necessary participant" to the sales of the unregistered securities for PCC Group, Alcar Chemicals, Magellan Energy, and Marinas International.

      3.   Use of Interstate Transportation or Communication

The requirement that interstate means or instruments of transport or communication, the mails, or a facility of a national securities exchange be used to violate Section 5 has been broadly construed.  See United States v. Wolfson, 405 F.2d 779, 784 (2d Cir. 1968).  In drafting Section 5, "Congress meant to exert its power to the full constitutional extent permitted by the commerce clause and the postal clause."  Id. at 783 (citation omitted).  For example, "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be

---

[19]   Wong only challenges the admissibility of the SEC's evidence -- challenges which were denied above.

foreseen, even though not actually intended, then he causes the mails to be used." Id. at 783-84 (citation omitted).[20]

The SEC alleges that Wong used interstate means in distributing press releases of some of the Hijacked Corporations, in conducting other functions of the Scheme, and in selling the Wong-Sold Securities into the United States.  The SEC has shown that it is entitled to summary judgment with respect to twelve securities.

a.   Distribution of Press Releases

Wong communicated from Canada with stock promoters Moline and Golden, in California and Georgia, respectively, to produce and distribute press releases with regard to seven Wong-Sold Companies, as well as Magellan Energy (the sale of the stock of which Wong was a necessary participant in).  Wong worked with Moline to promote the stock of several companies that had no registered securities in the relevant time period: Big Hub, Caribbean Developments, El Apparel, Grand Lux, International

---

[20]   The case law interpreting the interstate commerce requirement in the context of Rule 10b-5 violations is instructive here.  In both Rule 10b-5 and Section 5, the same language creates federal jurisdiction when a person "directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce" in engaging in the proscribed activity.  15 U.S.C. § 77e(a),(c); Rule 10b-5.  "The jurisdictional requirement[] of . . . Rule 10b-5 [is] broadly construed, so as to be satisfied by any activity connected with a national securities exchange, by intrastate telephone calls, and by even the most ancillary mailings."  SEC v. Softpoint, Inc., 958 F. Supp. 846, 865 (S.D.N.Y. 1997).

Energy, KSW Industries, LeaseSmart, and Magellan Energy.  This
included emailing Moline press releases for those companies,
intending that Moline distribute them in order to promote those
companies' stock.  Wong also admits to hiring Golden in order to
promote the securities of Caribbean Developments and KSW
Industries.  These activities used interstate means to offer
unregistered securities.

Wong argues that these communications were not necessarily
connected to Wong's sale of securities from his account.  But an
interstate act connected with an offer of unregistered
securities, regardless of whether Wong himself sold such
securities, is sufficient to violate Section 5.  See 15 U.S.C. §
77e(c).  Wong engaged in interstate communications to issue
press releases for the purpose of promoting newly-issued
securities in these eight Hijacked Corporations.

b.   Other Interstate Activity

There are three Hijacked Corporations whose unregistered
securities were sold as part of the Scheme and for which the SEC
seeks to hold Wong liable even though he did not promote or sell
those securities.  They are: Alcar Chemicals, Marinas
International and PCC Group.  Wong's other interstate activities
that were a part of the Scheme in connection with these Hijacked
Corporations -- filing documents on behalf of those companies
with the secretaries of state of various states, requesting new

47

CUSIP numbers from CUSIP Services in New York City, and filing TAVFs with NASDAQ in Connecticut -- provided the interstate commerce connection required for Section 5 liability.  In addition, Wong also filed forms with the California Secretary of State's Office in connection with Baker Communications using interstate means.  Baker Communications is one of the Hijacked Corporations whose securities he sold.  These interstate communications are also sufficient for a finding of liability.

        c.   Sales of Stock into the United States

In addition to these twelve securities, the SEC also seeks to hold Wong liable on its Section 5 claim as to the remaining three Wong-Sold Securities -- Asia Telecom, Cavico, and Microlink Solutions.  The SEC alleges that Wong used interstate means of communication by selling his shares in these Hijacked Companies into the United States through markets located in the United States, specifically, by using the OTC Pink Sheets.

The OTC Pink Sheets is a quotation service that certain broker-dealers use to post offers to sell and to buy securities not listed on a national exchange, and is not itself an exchange.  See Pension Committee of University of Montreal Pension Plan v. Banc of America, 568 F.3d 374, 377 (2d Cir. 2009) (contrasting listing on a national exchange with being listed on the "Over-the-Counter Bulletin Board and/or pink sheets"); SEC, Pink Sheets, www.sec.gov/answers/pink.htm

(describing the Pink Sheets as an "electronic quotation system" and the securities listed on them as "not meet[ing] the minimum listing requirements for trading on a national securities exchange").  All of the Wong-Sold Companies had securities listed on the OTC Pink Sheets, but there is no evidence that the specific shares that Wong sold were sold via offers to sell or buy on the OTC Pink Sheets.

The SEC does not explain the basis for its assumption that the Wong-Sold Securities were sold through the OTC Pink Sheets. Nor does the SEC argue that because there were some offers to buy or sell a particular Hijacked Corporation's stock on the OTC Pink Sheets, that all securities of that company were sold over the OTC Pink Sheets.[21]  Further briefing and evidence would be required to determine if Wong actually offered or sold his securities through this United States over-the-counter market, or if there is any other basis to find that Wong sold his securities through interstate means or to purchasers in the United States.  There remains a dispute of material fact that prevents finding that Wong's sales of securities of companies that had OTC Pink Sheets listings provide an independent basis

---

[21]    By contrast, the Second Circuit has found the interstate commerce requirement satisfied where an alleged violator of the federal securities laws insisted that his broker-dealer actually place bids on the OTC Pink Sheets.  Jaffee & Co. v. SEC, 446 F.2d 387, 392 (2d Cir. 1971).

of satisfying the interstate means requirement for the SEC's Section 5 claim.

Therefore, the SEC's motion for summary judgment on its Section 5 claim is granted only as to those securities that have been shown to be unregistered, that Wong sold or of which sale he was a necessary participant, and which Wong employed interstate means to offer or sell.  These are the securities of: Alcar Chemicals, Baker Communications, Big Hub, Caribbean Developments, El Apparel, Grand Lux, International Energy, KSW Industries, LeaseSmart, Marinas International, Magellan Energy and PCC Group (the "Section 5 Securities").  Wong's motion for summary judgment seeking a dismissal of the Section 5 claim is denied.

B.   Exemptions

The SEC having established its prima facie case as to the Section 5 Securities, the burden falls on Wong to demonstrate that the sales of these securities fall under an exemption or safe harbor to the federal securities laws.  Cavanagh II, 445 F.3d at 111 n.13.  "Registration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public."  Id. at 115.

1.   Section 4(1)

Wong argues, first, that the sales of the Section 5 Securities fall under the exemption articulated in Section 4(1)

of the Securities Act.  Section 4(1) exempts from registration those transactions conducted by someone other than an "issuer, underwriter or dealer."  15 U.S.C. § 77d(1).

An issuer is one "who issues or proposes to issue any security," 15 U.S.C. § 77(b)(a)(4), and includes "affiliates or subsidiaries of the issuer and any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer."  North Am. Research, 424 F.2d at 72 (citation omitted).[22]

> A control person, such as an officer, director, or controlling shareholder, is an affiliate of an issuer and is treated as an issuer when there is a distribution of securities.  Thus, an affiliate ordinarily may not rely upon the Section 4(1) exemption -- he must either re-register his shares or qualify for a different exemption before undertaking to sell them.

SEC v. Cavanagh, 155 F.3d 129, 134 (2d Cir. 1998) ("Cavanagh I").

An "underwriter" is "any person who has purchased from an issuer with a view to the distribution of any security."  Cavanagh II, 445 F.3d at 111 (citation omitted).  An "'underwriter' is broadly defined to include anyone who directly or indirectly participates in a distribution of securities from

---

[22]  The Second Circuit has "defined 'control' as the power to direct or cause the direction of the management and policies of the primary violators, whether through the ownership of voting securities, by contract, or otherwise."  In re Lehman Bros. Mortgage-Backed Secs. Litig., --- F.3d ----, 2011 WL 1778726, at *14 (2d Cir. May 11, 2011) (citation omitted).

an 'issuer' to the public." <u>North Am. Research & Dev. Corp.</u>, 424 F.2d at 72.  One factor considered in determining whether a shareholder's intent is to distribute the security is the length of time that person has held the security.  17 C.F.R. § 230.144 n.2.

     First, Wong argues that his own sales were entitled to exemption under Section 4(1) because he purchased or acquired the shares of all the Wong-Sold Securities, including some of the Section 5 Securities, either from the open market, through stock purchase agreements with The Stone Financial Group, Inc., or as payment from Andrei Swartzstein ("Swartzstein") and/or Alex Kaplun ("Kaplun").  Wong has presented no documentary evidence in support of any of these claims, only his own deposition testimony that he received shares of certain Section 5 Securities -- Big Hub, El Apparel, International Energy, KSW Industries, and LeaseSmart -- from Swartzstein as compensation for consulting services.  To the contrary, the admissible evidence shows that Wong acquired some of the securities of the Hijacked Corporations by asking other members of the Scheme to print these stock certificates for him.[23]  Therefore, no

---

[23]    Notably, Wong has presented no testimony from Swartzstein, and all the admissible evidence indicates Swartzstein is not a real person.  The SEC's investigator, following information provided by Wong, could not find any evidence of Swartzstein's existence.

reasonable jury could find that Wong had acquired the securities of the Hijacked Corporations that he sold as he claims.

In any event, Wong's involvement in the sales and offers of the Section 5 Securities disqualifies him from exemption even if the individual securities he acquired and sold were acquired from third parties, as he argues.  Wong acted as an affiliate of an issuer or as an underwriter with respect to each of the Section 5 Securities.  For example, Wong was the sole director, president, and CEO of SAT, during the time SAT served as the share transfer agent for sixteen of the Hijacked Companies. Wong was an officer of International Energy and LeaseSmart, according to documents filed with NASDAQ.  Boock directed Wong to issue shares of Big Hub.  Wong requested that DeFreitas issue a certificate for 100,000 shares of KSW Industries to stock promoter Tony Golden.  Later, Wong asked DeFreitas to issue a million shares of El Apparel and LeaseSmart to accounts Wong controlled.  Finally, Wong completely liquidated all of the Wong-Sold Securities quickly after acquiring them, often within a week.  The longest period he held any of these securities before liquidation was less than five months.  No reasonable jury could find that this behavior was indicative of an intent

to invest in the securities long-term, rather than an intent to quickly distribute the securities as an underwriter.[24]

2.   Regulation S

Wong argues that, in the alternative, Regulation S, 17 C.F.R. §§ 230.901, 904, exempts the Section 5 Securities from registration.  Regulation S is a non-statutory exemption for securities offered and sold outside the United States from the registration requirements under Section 5.  17 C.F.R. § 230.901. The general rule of Regulation S is that

> offers, offers to sell, and sales of securities made outside the United States are not subject to the registration requirement of § 5, while those within the United States must be registered.  The two so-called "safe harbor" exemptions permit the issuance and resale of securities under certain specified conditions.  Offerings and resales meeting these conditions are deemed to take place outside the United States for the purpose of § 5.

Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 124 (2d Cir. 1998) (citation omitted).  If one of two safe harbor exemptions within Regulation S is met, the offer and sale or resale of securities are deemed to take place outside the United States for the purpose of Section 5.

---

[24]   Wong makes a specific argument that his transactions in securities of Cavico should qualify for exemption from the registration requirement pursuant to Section 4(1) and Rule 504 of Regulation D, 17 C.F.R. § 230.504.  It is not necessary to explore these arguments because the SEC has not made a prima facie case that Wong violated Section 5 in relation to shares of Cavico or its predecessor.

17 C.F.R. § 230.903 (issuers, distributors[25] and affiliates); 17 C.F.R. § 230.904 (resellers).

Either safe harbor requires that the offer or sale is made in an offshore transaction, no directed selling efforts are made in the United States, and certain other conditions, if applicable, are met. 17 C.F.R. §§ 230.903-04. "The Regulation S exemption does not apply to transactions that, though in technical compliance, are designed to evade the registration requirement." Geiger v. SEC, 363 F.3d 481, 488 (D.C. Cir. 2004).

Wong argues that he is not an issuer, distributor, or affiliate of an issuer, so his transactions in the Section 5 Securities should be exempt under the safe harbor provided by § 230.904. As described above, in connection with each of the Section 5 Securities, Wong was an affiliate of an issuer, and in some cases, an underwriter. Therefore, he is not entitled to the exemption under § 230.904.[26]

---

[25]   For the purposes of Regulation S, a "distributor" includes underwriters and dealers in a security. 17 C.F.R. § 230.902(d).

[26]   Wong did not argue that his transactions were exempt under § 17 C.F.R. § 230.904, but such an argument would have been similarly unsuccessful, as he failed to carry his burden to demonstrate that he is entitled to an exemption to the registration requirements of Section 5. Cavanagh II, 445 F.3d at 111 n.13.

First, for eight of the Section 5 Securities, Wong engaged a U.S.-based stock promoter to distribute press releases in the United States. This activity constitutes "directed selling

IV.  Violations of the Antifraud Provisions of the Securities
Laws

   The SEC also moves for summary judgment on its fraud claims
based on Wong's participation in the Scheme.  The SEC alleges
that this participation was a violation of Section 17(a),
Section 10(b) and Rule 10b-5.

   Section 10(b) creates civil liability for those who

   use or employ, in connection with the purchase or
   sale of any security . . . any manipulative or
   deceptive device or contrivance in contravention of
   such rules and regulations as the [SEC] may
   prescribe as necessary or appropriate in the public
   interest or for the protection of investors.

---

efforts" as defined in Regulation S.  17 C.F.R. § 230.902(c);
see also Europe & Overseas Commodity Traders, 147 F.3d at 124
(directed selling efforts includes "marketing efforts such as
mailings . . . in the United States designed to induce the
purchase of securities"); 17 C.F.R. § 230 prelim. note 7
("[n]othing in these rules precludes access by journalists for
publications with a general circulation in the United States to
offshore . . . press releases . . . provided that the
information is made available to the foreign and United States
press generally and is not intended to induce purchases of
securities by persons in the United States") (emphasis
supplied).
   Second, each of the Section 5 Securities that were Wong-
Sold Securities were sold within five months of acquisition,
before the distribution compliance period required by 17 C.F.R.
§ 230.903(b)(3)(iii) elapsed.  In order to take advantage of the
safe harbor without allowing the distribution compliance period
to elapse, one needs to procure certain certifications by the
purchasers of the securities. 17 C.F.R. § 230.903(a)(3)(iii).
Wong has not offered any certifications as evidence, or even
alluded to their existence.
   Finally, Wong made no effort to show that the transactions
were, indeed, offshore.  He offered no evidence that the
purchasers of the Section 5 Securities were non-U.S. persons or
entities.

15 U.S.C. § 78j.  "Section 10(b) of the Exchange Act bars

conduct involving manipulation or deception, manipulation being

practices that are intended to mislead investors by artificially

affecting market activity, and deception being

misrepresentation, or nondisclosure intended to deceive."

Ganino v. Citizens Utilities Co., 228 F.3d 154, 161 (2d Cir.

2000) (citation omitted).  To demonstrate that Wong violated

Section 10(b) and Rule 10b-5, the SEC must show that he "(1)

made a material misrepresentation or a material omission as to

which he had a duty to speak, or used a fraudulent device; (2)

with scienter; (3) in connection with the purchase or sale of

securities."  SEC v. Monarch Funding Corp., 192 F.3d 295, 308

(2d Cir. 1999).  "The scienter needed in connection with

securities fraud is intent to deceive, manipulate, or defraud,

or knowing misconduct."  In re Carter-Wallace, Inc. Secs.

Litig., 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted).  Rule

10b-5, promulgated by the SEC under the authority of Section

10(b), imposes liability on those who "employ any device,

scheme, or artifice to defraud"; "make any untrue statement of a

material fact or [] omit to state a material fact necessary in

order to make the statements made, in the light of the

circumstances under which they were made, not misleading"; or

"engage in any act, practice, or course of business which

operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."  17
C.F.R. § 240.10b-5.

Securities Act Section 17(a) makes it unlawful for any
person "in the offer or sale of any securities" using the mails
or an instrumentality of interstate commerce, "directly or
indirectly,"

> (1)  to employ any device, scheme, or artifice to
>      defraud, or
> (2)  to obtain money or property by means of any
>      untrue statement of a material fact or any
>      omission to state a material fact necessary in
>      order to make the statements made, in light of
>      the circumstances under which they were made, not
>      misleading, or
> (3)  to engage in any transaction, practice, or course
>      of business which operates or would operate as a
>      fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).  "Essentially the same elements are required
under Section 17(a)(1)-(3) in connection with the offer or sale
of a security, though no showing of scienter is required for the
SEC to [demonstrate liability] under subsection (a)(2) or
(a)(3)." Monarch Funding, 192 F.3d at 308.  "The SEC does not
need to prove investor reliance, loss causation, or damages in
an action under Section 10(b)[,] Rule 10b-5, or Section 17(a)."
SEC v. Credit Bancorp, Ltd., 195 F. Supp. 2d 475, 490-91
(S.D.N.Y. 2002).

Under the Private Securities Litigation Reform Act of 1995,
in actions brought by the SEC, "any person that knowingly

provides substantial assistance to another person in violation
of a provision of [15 U.S.C. Chapter 2B, which includes §
10(b)], or of any rule or regulation issued under this chapter
[including Rule 10b-5], shall be deemed to be in violation of
such provision to the same extent as the person to whom such
assistance is provided." 15 U.S.C. § 78t(e). Thus, the SEC has
the authority to bring Section 10(b) claims against aiders and
abettors of primary violators.

A.   Participation in a Scheme or an Act, Practice, or
     Course of Business to Defraud

The basis for the SEC's antifraud claims is the Scheme, as
a "device, scheme, or artifice to defraud," or an "act,
practice, or course of business which operates or would operate
as a fraud or deceit" as described in Rule 10b-5 and Section
17(a)(1) and (3). "Conduct itself can be deceptive, and so
liability under § 10(b) or Rule 10b-5 does not require a
specific oral or written statement." United States v. Finnerty,
533 F.3d 143, 148 (2d Cir. 2008) (citation omitted).

The Scheme involved the misappropriation of dormant public
companies so that the Defendants could assert control over them,
merge them with client companies seeking to engage in a shell
deal, and then issue shares that would both dilute the value of
the legitimate shareholders of the Hijacked Corporations and
deceive shareholders about the true identity of the issuing

company.  The misappropriation was accomplished through the
deceptive documents filed with state secretaries of state,
NASDAQ and CUSIP Services in order to authorize name changes and
reverse stock splits of the Hijacked Corporations.  Wong
directly acted to further the Defendants' goals in nearly all of
the stages of this Scheme, including: working to sell shell
deals to the Defendants' clients; filing incorporation documents
for new entities with state secretaries of state; filing false
CUSIP request forms with CUSIP Services; filing false documents
requesting new NASDAQ symbols and reverse stock splits with
NASDAQ; issuing shares for the Hijacked Corporations and
instructing an employee how to issue shares for the Hijacked
Corporations; and creating a market for the securities of
Hijacked Corporations by working with stock promoters to issue
press releases.  Although there is no evidence that Wong was
directly involved in the first stage of the Scheme, locating
dormant companies to target, there is evidence that he was aware
that the Hijacked Corporations had been misappropriated by the
Defendants.  Wong's involvement is also evidenced by the
frequent communications and transfers of funds between him and
the other Defendants at the time of the Scheme.

     Wong does not deny that the Scheme, as chronicled by the
evidence, was a "device, scheme, or artifice to defraud" or an
"act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person," covered by Rule
10b-5 and Section 17(a)(1) and (3).  Indeed, both the testimony
of two of the Defendants, Boock and DeFreitas, and the
documentary evidence confirm the Scheme's existence in
substantially the form alleged by the SEC in the complaint.
Instead, Wong argues that the SEC has not shown that the
undisputed evidence supports his involvement in the Scheme.  But
this position relies on inadmissible evidence and unsupported
arguments, as well as on the incorrect assumption that much of
the SEC's properly admitted evidence would be struck as
inadmissible.  Most importantly, Wong relies on his unsupported
assertion, rejected above, that he was the victim of identity
theft.  Therefore, Wong has failed to show that there is a
dispute about a material fact that would prevent entry of
summary judgment against him.

    Finally, Wong's contention that the SEC is seeking to
impermissibly hold him liable for participation in a scheme in
which others made misleading statements misconstrues the SEC's
claim.  The SEC has shown that the Scheme itself, in which Wong
and other Defendants all directly participated, was a "device,
scheme, or artifice to defraud," or an "act, practice, or course
of business which operates or would operate as a fraud or
deceit", unlawful under Rule 10b-5(a) and (c) and Section
17(a)(1) and (3).  Therefore, the fact that the SEC may not have

shown that Wong himself made a material misrepresentation or a
material omission does not raise a genuine issue of material
fact.

       B.    The Scheme Was in Connection with the Offer or Sale of
            Securities.

    The Supreme Court has said that Section 10(b) should be
"construed not technically and restrictively, but flexibly to
effectuate its remedial purposes." SEC v. Zandford, 535 U.S.
813, 819 (2002). Therefore, it has found the SEC's broad
reading of the phrase "in connection with the purchase or sale
of any security" is reasonable and entitled to deference. Id.
"[I]t is enough that the fraud alleged coincide with a
securities transaction -- whether by the plaintiff or by someone
else. The requisite showing, in other words, is deception in
connection with the purchase or sale of any security, not
deception of an identifiable purchaser or seller." Merrill
Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85
(2006)(considering the "in connection with" language under the
Securities Litigation Uniform Standards Act of 1998 by reference
to the Court's precedents interpreting the same language in
Section 10(b) and Rule 10b-5 (citation omitted)).

    Wong does not deny that the Scheme, or his particular
participation in the Scheme, was carried out in connection with
the sale of securities. The undisputed evidence shows that the

purpose of the Scheme was to take control of dormant public companies so that the Defendants could sell the securities of such companies.  Therefore, the SEC has met its burden with regard to this element of its securities fraud claims.

C.   Scienter

For those of the SEC's claims that do require a showing of scienter,[27] it has been amply demonstrated.  ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009).  Facts showing motive and opportunity to commit fraud, such as that a defendant "benefitted in some concrete and personal way from the purported fraud," establish actual intent.  Id. (citation omitted).  "[T]he motive showing is generally met when corporate insiders allegedly make a misrepresentation [or use a scheme to defraud] in order to sell their own shares at a profit."  Id.  In the alternative, scienter can be demonstrated through "strong circumstantial evidence of conscious misbehavior or recklessness."  Id. at 198-99.

> At least four circumstances may give rise to a strong
> inference of the requisite scienter: where the
> complaint sufficiently alleges that the defendants (1)
> benefitted in a concrete and personal way from the
> purported fraud; (2) engaged in deliberately illegal
> behavior; (3) knew facts or had access to information
> suggesting that their public statements were not

---

[27]   As mentioned above, the SEC need not show Wong's scienter for its claim under Section 17(a)(3).  Monarch Funding, 192 F.3d at 308.

accurate; or (4) failed to check information they had
a duty to monitor.

Id. at 199 (citation omitted).

Wong's motive is amply demonstrated from the benefits he
received from the Scheme.  He was issued securities by the
Hijacked Corporations, which he then promptly sold.  Wong also
received payments into his accounts for services performed as
part of the Scheme, such as his involvement in the Baker
Communications shell deal.  In addition, the undisputed facts
show that he engaged in deliberate fraudulent behavior by filing
documents with the NASDAQ, CUSIP Services and state secretaries
of state offices that he knew had false information and that
would cause dormant public companies to pass into the control of
the Defendants, and by instructing Allie how to forge signatures
in order to issue securities of the Hijacked Corporations.

Wong's denial of scienter rests on his identity theft
theory, which fails to address the substantial admissible
evidence showing Wong's intentional and extensive involvement in
the Scheme.  No reasonable jury could find that Wong was
anything other than an intentional and full-fledged participant
in the Scheme.

V.   Disgorgement Relief

"[D]isgorgement is a well-established remedy in the Second
Circuit, particularly in securities enforcement actions," which

64

derives from a court's power under Article III of the
Constitution and Section 11 of the Judiciary Act.  Cavanagh II,
445 F.3d at 116-17.  In ordering disgorgement, a court will
engage in fact-finding "to determine the amount of money
acquired through wrongdoing -- a process sometimes called
'accounting'" and issue an "order compelling the wrongdoer to
pay that amount plus interest."  Id.

     "[T]he primary purpose of disgorgement orders is to deter
violations of the securities laws by depriving violators of
their ill-gotten gains."  Official Comm. of Unsecured Creditors
of WorldCom, Inc. v. SEC, 467 F.3d 73, 81 (2d Cir. 2006)
(citation omitted).  "Given that compensation of fraud victims
is a secondary goal, the size of a disgorgement order need not
be tied to the losses suffered by defrauded investors."  Id.
(citation omitted).  "[D]isgorgement need only be a reasonable
approximation of profits causally connected to the violation.
So long as the measure of disgorgement is reasonable, any risk
of uncertainty should fall on the wrongdoer whose illegal
conduct created the uncertainty."  SEC v. Warde, 151 F.3d 42, 50
(2d Cir. 1998) (citation omitted).  When two or more defendants
collaborate in the illegal conduct and liability must be
apportioned among them, courts have the discretion to find joint
and several liability for any disgorgement relief.  SEC v.
AbsoluteFuture.com, 393 F.3d 94, 97 (2d Cir. 2004).  But, "the

total disgorgement amount cannot exceed the combined profits of the defendants." Id.  A court has "the discretion to find joint and several liability" for an amount not to "exceed the combined profits of the defendants." AbsoluteFuture.com, 393 F.3d at 97.

Wong's argument that the SEC has not pled "elements of a claim for disgorgement relief" in its complaint misunderstands the distinction between a legal claim and the relief to which a plaintiff might be entitled if it succeeds in proving its claim. Disgorgement is relief available to the SEC if it is has proven its claims of violations of the securities laws.  Once a court has determined a securities violation has occurred, there is no separate legal claim for disgorgement that the SEC must prove; rather, a process of fact-finding will follow a finding of liability "to determine the amount of money acquired through wrongdoing." Cavanagh II, 445 F.3d at 116.  Now that Wong's liability has been determined, supplemental proceedings will determine the amount of disgorgement.

CONCLUSION

The SEC's February 25, 20111 motion for summary judgment is granted in part, Wong's February 25, 2011 motion for partial summary judgment is denied, and the SEC's April 14, 2011 motion to strike is granted in part.


        SO ORDERED:

Dated:     New York, New York
           August 25, 2011

                              _____
                                       DENISE COTE
                              United States District Judge